This was an action brought to recover damages for the killing of plaintiff's intestate, who was run over by defendant's train while lying on the roadbed of the defendant company. The chief question (56) before the jury, as stated in the petition to rehear, was whether the engineer exercised due or ordinary care in keeping a proper lookout upon the track; and whether, if he had kept a proper lookout, he could have discovered the intestate in an apparently helpless condition in time to have stopped the train and avoided the injury. *Page 41 
W. A. Horton, the engineer, introduced by defendant, after testifying as to the proper equipment of the train and other particulars of the accident, testified as follows:
Q. As you approached the station of Peachland, were you keeping a lookout? A. Yes, sir; I was looking right in the track.
Q. What kind of lookout were you keeping? A. A careful one, watching the track all the time.
Q. As you passed from Peachland, keeping a lookout, did you discover anything? If so, when and where? A. Well, after I passed that mail crane there, about midway between that and the crossing, I saw the deceased's face.
Q. You saw his head? A. Yes, sir. I saw his face up near the rail. I think I was about 100 yards from him, as best I could tell, from the telegraph poles. It was about half-way between the mail crane and the top of the hill.
Q. As you approached the station of Peachland, how is the grade? A. As you come up to the station it is upgrade to a point nearly opposite the warehouse.
Q. After you leave the station, how is it? A. Then it begins to go down.
Q. Which is the steepest? A. The grade on the east side of the depot is greater than on the west side; that is, it is steeper, but it goes down from the station as you go in.
Q. Did you discover any portion of his body? A. No, sir; I did not see anything of his body until I got right over him.
Q. Was his head on the rail or adjoining the rail? A. The back part of his head was up against the rail. His head was not on the rail at all.
Q. Was it on the cross-ties? A. I am not positive about that. I really believe when we got back there that his head was leaning on the cross-ties.
Q. You are not certain how it was before? A. No, sir.
Q. When you discovered that face of a man, what did you do?
A. I applied the brakes so as to stop. (57)
Q. What kind of brakes? A. Air brakes. I throwed them in the emergency application, and stopped the train as quick as possible.
Q. Could you have stopped any sooner by any means that you have that you did not use then? A. No, sir.
Q. How do you apply emergency brakes? A. Well, the brake valve is right in front of you.
Q. What means did you have to use in making the stop? A. The brake valve right in front of me, and the sand blower. They are right together there. *Page 42 
Q. Did you use both of them? A. I am not positive about the sand.
Q. Give me your best impression. A. I cannot say positively I used the sand. My impression is that I did do it.
Q. How far did your train run before it was stopped? A. From the time I put on the brakes to where it stopped was something like 1,200 feet.
Q. How far beyond the place where the man was did you go? A. It looked like about a train length from the rear end of the train to where we went back to him. It was in the night. Since then, I know where I stopped at, and I know it was about that distance.
Q. State whether or not this face could have been discovered by a person on an engine at a greater distance than it was discovered by you that night? A. No, sir; I do not think it could.
Q. Could a train have stopped at that place, traveling 45 miles an hour, in a shorter distance than it was stopped by you that night? A. No, sir; I do not think it could.
Q. How long have you been an engineer over this particular road? A. Ten or twelve years.
Q. Have you looked to see, at this particular point, where this person was since this accident? A. Oh, yes, sir; I look at it every other day. I come by there every other morning.
Q. Have you had occasion to look at it with a good headlight, to see in what distance it could be seen? A. Yes, sir; I have been up there several times.
Q. What do you say now as to what distance he could have been seen?
A. One hundred yards is about the furthest distance anybody would be able to see him.
(58) Q. I mean you. A. That is as near as I have ever been able to see him.
On cross-examination this witness, W. A. Horton, questioned by plaintiff, answered as follows:
Q. Did you not tell Mr. Bailes that night that your plow struck him? (Defendant objected. Overruled, and exception.) A. No, I did not.
Q. Did not you tell Mr. Bailes, also, that you saw the man in time to stop, but that you thought it was a piece of paper, or something of that kind? (Defendant objected. Overruled, exception.) A. No, sir.
Q. You had a conversation with Mr. Bailes that night? (Defendant objected. Overruled, and exception.) A. I did not.
Q. Did you not say in Bailes' presence that night that your plow struck him? (Defendant objected. Overruled, and exception.) A. No, sir; I did not.
Q. Did you not, in Mr. Bailes' presence that night, say that you saw the body in time to have stopped the train, but you thought it was a *Page 43 
piece of paper or something, and you did not stop? (Defendant objected. Overruled, and exception.) A. I did not.
Q. Did not you say in Mr. Bailes' presence, or to Mr. Bailes, that night, that you did not discover it was a man until you got to the frog of the switch? (Defendant objected. Overruled, and exception.) A. I did not.
Mr. J. T. Bailes was examined on behalf of plaintiff, and, among other things, testified as follows:
Q. Did you have any conversation with Engineer Horton the night Mr. Griffin was killed? A. I did.
Q. Did Mr. Horton tell you that night, while you were standing there over or near the body of Mr. Griffin, that the plow struck him? (Defendant objected. Overruled, and exception.) A. He did.
Q. Did he tell you, or say in your presence, that he saw the man in time to stop, but that he thought it was a piece of paper until he got near to him or over him? (Defendant objected. Overruled, and exception.)
A. He did.
Q. Did he state to you, or in your presence, that his head was lying on the rail, and his plow struck him? (Defendant objected. Overruled, and exception.) A. He did.
The defendant asked the court to instruct the jury as follows: (59)
"That if the jury find from the greater weight of the evidence that the plaintiff's intestate could see the train approaching while he was in a place of danger with his head near the rail or on the rail, and was neither in an unconscious nor helpless condition, and failed to get out of the way of the train, but remained stationary, you will answer the first issue `No.'" Refused, and defendant excepted.
The court charged the jury as follows: "If the jury should find that the intestate, although killed by the moving train of the defendant, saw the approaching train, and was conscious of the danger, and had the time and ability to remove himself from the position of peril, and failed to do so, then the plaintiff would not be entitled to recover, and the jury would answer the first issue `No,' and they need not consider the other issues." Defendant excepted.
We have given this case a careful examination and find no new point presented and no authority cited which was not considered by us at the last term. The instruction of the court to the jury, *Page 44 
which is assigned as error, was substantially responsive to the defendant's prayer relating to the same phase of the case, and there is, therefore, no cause to complain of it. Thompson v. Tel. Co., 107 N.C. 449;Greenleaf v. R. R., 91 N.C. 33. We do not see that the instruction, when properly construed, was inherently wrong. The other point made as to the failure of the judge to explain to the jury the use that could be made by them of the testimony of the witness Bailes, who is alleged to have contradicted the defendant's witness Horton, cannot be sustained. We do not think there was any misunderstanding by the (60) jury of the nature and effect of this evidence, and there certainly has not been any real miscarriage of justice. The parties themselves did not seem to attach much, if any, importance to the alleged omission to charge upon this point. Assuming, for the sake of argument, that there was an omission in this respect, it was not so grave under the facts and circumstances of this case appearing in the transcript, as to constitute reversible error. We do not mean to intimate that there was any error at all, but, if there was, it was very slight and no substantial prejudice to the defendant has resulted therefrom. 2 Enc. Pl. and Pr., 499 et seq., and notes. It is unnecessary to discuss the assignment more in detail, as by reason of the recent rule of this Court upon the subject this case cannot become a precedent. The case seems to have been fairly tried on the merits, and the verdict and judgment should not be disturbed.
Petition dismissed.
Cited: Freeman v. Brown, 151 N.C. 113; Singleton v. Roebuck,178 N.C. 205; S. v. Stancill, ib., 685. Marshall v. Telephone Co.,181 N.C. 298.